UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHU DING,<br><br>                              Plaintiff,<br><br>v.<br><br>CITY OF SAN DIEGO, et al.,<br><br>                              Defendants. | Case No.:  25-cv-01683-AJB-JLB<br><br>**ORDER**<br><br>(Doc. Nos. 14; 15) |

Before the Court are the motions to dismiss filed by "Individual Defendants"[1] and the City of San Diego (the "City"). (Doc. Nos. 14; 15.) This Order collectively refers to both Individual Defendants and the City as "Defendants." Also before the Court are Defendants' Request for Judicial Notice/Incorporation by Reference in Support of Their Motions to Dismiss. (Doc. Nos. 14-2; 15-2.) The motions and requests are fully briefed. (Doc. Nos. 14–15; 21–25.)

Defendants' motions are **GRANTED IN PART AND DENIED IN PART**. Defendants' requests are also **GRANTED IN PART AND DENIED IN PART**.

---

[1]     The Individual Defendants are Jonathan Ferraro, Patrick Richards, Emilee Emamjomeh, James Ealson, and Scott Wahl. (*See* Doc. No. 1 ¶¶ 9–13.) The Complaint does not specify whether the Individual Defendants are sued in their personal or official capacities, or both. (*See generally* Doc. No. 1.) Where necessary, this Order refers to specific Individual Defendants by their surname.

1

Plaintiff Chu Ding ("Ding") may file a first amended complaint on or before **May 26, 2026**.

I.     BACKGROUND

A.     Factual Background

On July 2, 2024, Ding and Ferraro engaged in a verbal and physical alteration in a Costco parking lot. (Doc. No. 1 ¶¶ 20–21, 31–38.) During the altercation, Ferraro screamed that he was "the police." (*Id.* ¶ 34.) Ferraro was off-duty and wearing civilian clothes. (*Id.* ¶ 35.) The altercation ended when Ferraro knocked Ding unconscious. (*See id.* ¶¶ 37–38.)

Afterwards, eight San Diego Police Department officers and detectives arrived at the scene. (*Id.* ¶¶ 40, 58.) Richards immediately handcuffed Ding so tightly that the cuffs injured Ding. (*Id.* ¶¶ 40–46, 59.) Richards refused to loosen the handcuffs. (*Id.* ¶ 59.) Emamjomeh arrived after Richards and entered the Costco to review and retrieve Costco's surveillance footage. (*Id.* ¶¶ 50–51.) Richards and Emamjomeh kept Ding in Richards' patrol car for approximately three hours while the officers and detectives investigated the altercation. (*Id.* ¶¶ 49, 53.)

Following the investigation, Richards, Emamjomeh, and an unidentified officer arrested Ding. (*Id.* ¶ 61.) Richards then drove Ding to a police station. (*Id.* ¶ 62.) At the station, Richards, Emamjomeh, and the unidentified officer did not offer Ding medical attention and interrogated Ding instead. (*Id.* ¶ 66.) Emamjomeh and the unidentified officer coerced Ding into writing an apology letter to Ferraro. (*Id.* ¶¶ 73–79.)

According to Ding, the officers' and detectives' actions were engineered to cover up Ferraro's misconduct. (*Id.* ¶¶ 58, 80.)

After Ding finished the letter, Richards was instructed to take Ding to an emergency room. (*Id.* ¶ 87.) There, Ding reported to a doctor that he was suffering from head, neck, right shoulder, right rib, and left knee pains. (*Id.* ¶ 93.) Ding also informed the doctor that he had lost consciousness during the altercation. (*Id.* ¶ 94.) After receiving his diagnoses and treatment, Ding was discharged back into Richards' custody. (*Id.* ¶¶ 95–102.) Ding was then booked at Central Jail and subsequently released on bond. (*Id.* ¶¶ 102–05.)

**B.    Procedural Background**

On July 1, 2025, Ding initiated this Action. (*Id.*) Ding alleges eleven causes of action: (1) use of excessive force in violation of 42 U.S.C. § 1983 against Ferraro and Richards; (2) wrongful detention in violation of 42 U.S.C. § 1983 against Ferraro, Richards, and Doe Defendants; (3) false arrest in violation of 42 U.S.C. § 1983 against Ferraro, Richards, Emamjomeh, and a Doe Defendant; (4) failure to supervise and discipline in violation of 42 U.S.C. § 1983 against Wahl, Ealson, and Doe Defendants; (5) *Monell* liability in violation of 42 U.S.C. § 1983 against the City; (6) negligence against all Defendants; (7) assault and battery against Ferraro and Richards; (8) false imprisonment against Ferraro, Richards, Emamjomeh, and a Doe Defendant; (9) violations of California Civil Code § 52.1 against all Defendants; (10) a violation of California Civil Code § 51.7 against Ferraro; and (11) intentional infliction of emotional distress against Ferraro, Richards, Emamjomeh, a Doe Defendant, and the City.[2] (*Id.* ¶¶ 202–326.)

Defendants move to dismiss all causes of action, except for Count Ten against Ferraro. (Doc. Nos. 14; 15.)

This Order follows.

## II.    LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a plaintiff's complaint. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "[A] court may dismiss a complaint as a matter of law for (1) lack of cognizable legal theory or (2) insufficient facts under a cognizable legal claim." *SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) (citation and internal quotation marks omitted). However, a complaint will survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[2]    Ding identifies "County" as a defendant for the first time in his eleventh cause of action. (*See id.* ¶¶ 322–26.) Because Ding does not identify any specific county as a defendant in the caption of the Complaint or in the numbered paragraphs identifying the parties to this Action, the Court construes the references to "County" to refer to the City. (*See id.* ¶¶ 8–16.)

(2007). In making this determination, a court reviews the contents of the complaint, accepting all factual allegations as true and drawing all reasonable inferences in favor of the nonmoving party. *See Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007).

Notwithstanding this deference, the reviewing court need not accept legal conclusions as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It is also improper for a court to assume "the [plaintiff] can prove facts that [he or she] has not alleged." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

## III.   DISCUSSION

### A.   Requests for Judicial Notice and/or Incorporation by Reference

Pursuant to Federal Rule of Evidence 201(b), courts "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Granting judicial notice provides a substantial benefit in civil cases because "the court must instruct the jury to accept the noticed fact as conclusive." Fed. R. Evid. 201(f).

In contrast to judicial notice, "incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). A document "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). However, "the mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

Defendants ask the Court to take judicial notice of, incorporate by reference, or otherwise consider six video recordings. Specifically, Defendants offer a surveillance recording from Costco, four recordings from Richards' body-worn camera, and one recording from Emamjomeh's body-worn camera. (Doc. No. 14-2 at 1–2.)[3]

The Court **GRANTS IN PART AND DENIES IN PART** Defendants' request.

### 1.    Surveillance Recording

Beginning with the Costco surveillance recording, although Defendants ask the Court to judicially notice the recording, they do not explain how or why judicial notice would be appropriate. (*See generally* Doc. No. 14-2; *see also* Doc. Nos. 24 at 4–10; 25 at 5.) The Court therefore declines to take judicial notice of the recording pursuant to Federal Rule of Evidence 201.

However, the Court finds that Ding incorporated the surveillance recording by reference. As noted above, a document "may be incorporated by reference into a complaint if . . . the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 908. This includes when a document is not mentioned in the claim, but the claim "necessarily depend[s]" on the contents of the unreferenced document. *Khoja*, 899 F.3d at 1002 (citing *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005)).

Ding asserts that incorporation by reference is inappropriate because "there are three brief references in the complaint to the Costco video only." (Doc. No. 23 at 5 (citing Doc. No. 1 at 2 & ¶¶ 51, 53).) This is incorrect.

Count Three asserts that Defendants falsely arrested Ding because Richards, Emamjomeh, and a Doe Defendant "saw the [surveillance recording] footage from Costco and knew that Ferraro was the aggressor who assaulted and battered Mr. Ding." (Doc. No.

---

[3]    Defendants attached identical requests to both the Individual Defendants' motion to dismiss as well as the City's motion to dismiss. (*Compare* Doc. No. 14-2, *with* Doc. No. 15-2.) The Court thus cites only the request attached to the Individual Defendant's motion to dismiss.

Additionally, page citations refer to the pagination generated by the Case Management/Electronic Case Files system.

1 ¶ 230.) Thus, Defendants knew "[t]here was no legal basis to detain or arrest Mr. Ding who had committed no crimes." (*Id.* ¶ 229.) Count Eight duplicates these assertions. (*Id.* ¶¶ 295–96.) Meanwhile, Count Eleven indicates that it is based on Ding's false arrest claim, or Count Three. (*Id.* ¶ 324.)

Under these circumstances, Counts Three and Eight acknowledge the surveillance recording "forms the basis of the . . . claim[s]," *Ritchie*, 342 F.3d at 908, and "necessarily depend[]" on the recording's contents, *Khoja*, 899 F.3d at 1002. And since Count Eleven is based on Count Three, it too relies on the surveillance recording to state a claim. *See Ritchie*, 342 F.3d at 908; *Khoja*, 899 F.3d at 1002.

### 2.   Body-worn Camera Recordings

Turning to the body-worn camera recordings, the Court neither judicially notices the recordings nor finds them incorporated by reference.

As with the surveillance recording, Defendants do not explain how or why judicial notice of the body-worn camera recordings is appropriate. (*See generally* Doc. No. 14-2; *see also* Doc. Nos. 24 at 4–10; 25 at 5.)

In contrast to the surveillance recording, Ding's Complaint does not reference the body-worn camera recordings and does not necessarily depend on the recordings. (*See generally* Doc. No. 1.) It appears that Count Four is the only claim that may rely on the body-worn camera recording to state a claim. Specifically, Ding alleges therein that Ealson "reviewed the evidence against Mr. Ding and knew that his arrest was baseless and without probable cause." (*Id.* ¶ 245.) Ding does not specify what "the evidence" includes, but it is plausible that "the evidence" could include the body-worn camera recording. (*See generally id.*) Nevertheless, it is equally plausible that "the evidence" could consist solely of the surveillance recording or something else altogether. Under these circumstances, it is not clear that Count Four "necessarily depend[s]" on the body-worn camera recordings. *Khoja*, 899 F.3d at 1002.

The Court thus declines to judicially notice the body-worn camera recordings or to find them incorporated by reference.

25-cv-01683-AJB-JLB

### 3.    Other Consideration

Beyond seeking judicial notice and/or incorporation by reference, Defendants ask the Court to consider the videos "to serve the Supreme Court's edict to determine qualified immunity at the earliest possible stage." (Doc. No. 14-2 at 4.) Defendants contend that the Court will "thwart[]" the Supreme Court's "directive" if it "declines to consider readily available, authentic body-worn camera footage that conclusively establishes the reasonableness of the officers' conduct." (*Id.*)

Not so.

Defendants have multiple avenues by which they could ask the Court to consider the videos. For example, Defendants could follow the example set in *Scott v. Harris*, where the defendants moved for summary judgment. 550 U.S. 372, 375–76 (2007). A motion for summary judgment may be filed "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). Defendants could have raised their qualified immunity defense and introduced the videos through such a motion. Fed. R. Civ. P. 56(c). Defendants did not.[4] Defendants alternatively could have asked the Court to convert their motions to dismiss into Rule 56 motions. Fed. R. Civ. P. 12(d). Defendants did not. In fact, Defendants insist that they "did not convert [their] motion[s] into motion[s] for summary judgment by submitting the videos." (Doc. No. 25 at 2.)

Defendants instead filed motions to dismiss pursuant to Rule 12. (*See generally* Doc. Nos. 14; 15.) "Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Khoja*, 899 F.3d at 998 (citation omitted). Defendants are well aware of this restriction. (*See* Doc. No. 25 at 2 ("Plaintiff correctly points out a Court generally does not consider documents outside a complaint on a motion to dismiss under [Rule] 12(b).").)

---

[4]    Presumably, this is because Defendants wish to avoid the Court allowing Ding "time to obtain affidavits or declarations or to take discovery" or "issu[ing] any other appropriate order." Fed. R. Civ. P. 56(d). (*See* Doc. No. 14-2 at 5.)

It is thus Defendants who have chosen to focus the Court's inquiry on the substance of Ding's Complaint. It is, in turn, Defendants' own choices that have "thwarted" any "edict to determine qualified immunity at the earliest possible stage." (Doc. No. 14-2 at 4.)

Defendants do not get to complain of the consequences of their own conduct and deprive Ding of an "opportunity to respond to the [Defendants'] new version of the facts." *Khoja*, 899 F.3d at 1003. The Court will not endorse such gamesmanship.

The Court accordingly will not consider any recordings outside of the context of judicial notice or incorporation by reference.

### B.    Motions to Dismiss Based on Recordings

The Court now turns to the consequence, or lack thereof, of finding the Costco surveillance recording incorporated by reference.

Defendants argue the recording shows that "Ding's factual allegations are, at best, misleading." (Doc. No. 14-2 at 4.) Defendants offer two cases to assert the Court should accept their characterization of the recording instead and dismiss the bulk of the Complaint: *Johnson v. City of Atlanta*, 107 F.4th 1292 (11th Cir. 2024), and *J.K.J. v. City of San Diego*, 42 F.4th 990 (2021). (Doc. Nos. 14-2 at 4–6; 29 ¶¶ 6–10.)[5]

---

[5]    Defendants cited "*J.K.J. v. City of San Diego*, 93 F.4th 1061 (9th Cir. 2024)," and "*Davis v. City of Apopka*, 78 F.4th 1322 (11th Cir. 2023)," in their initial request. (Doc. No. 14-2 at 5–6.) The Court was unable to locate these authorities and so "direct[ed] Defendants to provide copies of the cited authorities with the relevant passages highlighted." (Doc. No. 26 at 2.) The Court also required Defendants' counsel to "state whether generative AI was used in writing [Defendants'] Motions and Requests." (*Id.*)

Counsel for Defendants explains that she was "distracted" by a medical diagnosis while preparing the requests. (Doc. No. 29 ¶ 3.) At that time, she used AI to conduct research and reviewed the cases identified by AI. (*Id.* ¶¶ 4–5.) However, she ultimately "mistyped" the citations and subsequently failed to catch the incorrect citations before filing the documents. (*Id.* ¶¶ 6, 11.)

The Court appreciates counsel's candor. The Court acknowledges that the use of generative AI "can be helpful if done properly and carefully." *Fletcher v. Experian Info. Solutions, Inc.*, 168 F.4th 231, 235 (5th Cir. 2026). In using AI, however, lawyers "must ensure that the legal propositions and authority generated are trustworthy." *ByoPlanet Int'l, LLC v. Johansson*, 792 F. Supp. 3d 1341, 1347 (S.D. Fla. 2025). It appears that counsel fulfilled this obligation and that the incorrect citations were the result of human error. (*See* Doc. No. 29 ¶¶ 4, 6, 11.) The Court accordingly accepts counsel's apology and encourages counsel to establish and implement measures to ensure such errors do not occur again. (*See id.* ¶¶ 11–12.)

Ding objects that "[t]he Court should reject Defendants' procedural gambit and require them to address the claims within the proper framework of Rule 12(b)(6)," and disputes Defendants' characterization of the surveillance recording. (Doc. No. 23 at 4–7.)

Although the Court finds the surveillance recording incorporated by reference, it declines to draw any inferences from the recording at this stage.

The Ninth Circuit has warned that "what inferences a court may draw from an incorporated document should . . . be approached with caution." *Khoja*, 899 F.3d at 1003. This is because the incorporation by reference doctrine "is not a tool for defendants to short-circuit the resolution of a well-pleaded claim." *Id.* Under these circumstances, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* Declining to draw inferences from incorporated documents is thus "consistent with the prohibition against resolving factual disputes at the pleading stage." *Id.*

Defendants' reliance on *J.K.J.*, 42 F.4th 990, and *Johnson*, 107 F.4th 1292, to assert otherwise is misplaced.

First, *J.K.J.* indicates that the Court should not rely on the surveillance recording to reject Ding's allegations. Preliminarily, the Ninth Circuit has vacated the *J.K.J.* decision on which Defendants rely. *J.K.J. v. City of San Diego*, 59 F.4th 1327 (9th Cir. 2023). "[A] decision that has been *vacated* has no precedential authority whatsoever." *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991).

In any event, the vacated *J.K.J.* decision explained that a district court's incorporation by reference of certain body camera footage was permissible when the court did not "allow the video to replace or supersede the allegations in the complaint" and instead treated only the "written allegations as essential for deciding the motion to dismiss." 42 F.4th at 998 (cleaned up). The vacated decision consequently approved of the underlying incorporation by reference because "the District Court did not assume the video to be true 'only . . . to dispute *facts* stated in' [the plaintiff's] pleadings." *Id.* (quoting *Khoja*,

899 F.3d at 1003) (emphasis added in *J.K.J.*). Declining to draw inferences from the surveillance recording is thus consistent with *J.K.J.*

Second, Ninth Circuit precedent precludes any reliance on *Johnson*. This Court is bound by Ninth Circuit precedent. *In re Zermeno-Gomez*, 868 F.3d 1048, 1052 (9th Cir. 2017). "[C]aselaw on point *is* the law" and "[b]inding authority must be followed unless and until overruled by a body competent to do so." *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001). Here, *Khoja* explicitly states that "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." 899 F.3d at 1003. The Eleventh Circuit is not a "body competent" to overrule this binding Ninth Circuit authority. *See Hart*, 266 F.3d at 1171 ("Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court.").

Because *Khoja* squarely forecloses Defendants' request for the Court to reject Ding's allegations based on the incorporated recording, the Court limits its review of the motions to allegations within the Complaint's four corners. *See* 899 F.3d at 1003.

Turning to the merits of Defendants' motions, Defendants base the majority of their motions on their characterizations of the video recordings' portrayal of the events on which Ding's claims are based. Specifically, Defendants claim the recordings show that the Individual Defendants acted reasonably and with ordinary care, requiring dismissal of Counts One, Two, Three, Six, Seven, Eight, Nine, and Eleven. (Doc. No. 14-1 at 15–17 (Counts One, Seven), 17–19 (Counts Two, Three, Eight), 21–22 (Count Six), 22–24 (Count Nine), 24–25 (Count Eleven).) Defendants also indicate that the *Monell* claim, Count Five, cannot survive because the videos demonstrate that the Individual Defendants did not deprive Ding of any constitutional rights. (Doc. No. 15-1 at 16.) Defendants ask the Court, in turn, to "strike" Plaintiff's allegations that are "blatantly contradicted by the various videos." (Doc. No. 24 at 10.) Defendants claim that, "[w]ithout these allegations, Plaintiff does not allege sufficient facts to support plausible claims against" Defendants. (*Id.*; *see also* Doc. No. 25 at 5.)

Because it is improper for the Court to use the recordings to reject Ding's allegations, *Khoja*, 899 F.3d at 1003, Defendants' motions to dismiss based on the video recordings are **DENIED**.

## C.  Motions to Dismiss on Other Grounds

Defendants assert four additional bases for partial dismissal of the Complaint. First, Defendants contend that the Individual Defendants are entitled to qualified immunity on Counts One, Two, and Three because no law put them on notice that their conduct was unlawful. (Doc. No. 14-1 at 25–26.) Second, Defendants aver that the Court should dismiss Count Four because the Complaint does not allege sufficient facts to show that Ealson and Wahl were personally involved in the alleged violations or that Ealson's and Wahl's conduct caused the alleged violations. (*Id.* at 19–21.) Third, Defendants claim that Ding has failed to establish that the City had a policy or custom that amounted to deliberate indifference to Ding's constitutional rights, and so Ding has failed to allege a *Monell* claim. (Doc. No. 15-1 at 13–17.) Fourth, Defendants assert that Count Eleven should be dismissed because Ding relies on "the formulaic recitation of the elements prohibited by *Twombly* and *Iqbal*" to allege the claim. (Doc. No. 14-1 at 24–25.)

The Court addresses each of these arguments in turn.

### 1.  Counts One, Two, and Three – Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "When, as here, defendants assert qualified immunity in a motion to dismiss under Rule 12(b)(6), 'dismissal is not appropriate unless we can determine, based on the complaint itself, that qualified immunity applies.'" *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (quoting *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001)).

"Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts

25-cv-01683-AJB-JLB

alleged show the officer's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Krainski v. Nevada ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 968 (9th Cir. 2010) (citation and internal quotation marks omitted). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

Although Supreme Court precedent "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (alteration and quotation marks omitted).

### a.   Ferraro

Ding alleges three relevant claims against Ferraro. First, Ferraro used excessive force during the altercation. (Doc. No. 1 ¶¶ 203–06.) Second, Ferraro unlawfully detained Ding when Ding had not committed any crime. (*Id.* ¶¶ 216–18.) Third, Ferraro conspired to have Ding falsely arrested even though Ding had not committed any crime. (*Id.* ¶¶ 228–29.)

Defendants assert that Ferraro is entitled to qualified immunity against these claims because "there are no cases putting Sgt. Ferraro on notice that he could not defend himself or use reasonable force to take Ding to the ground." (Doc. No. 14-1 at 26.)

Ding disagrees. (Doc. No. 21 at 14–17.)

The information before the Court indicates that Ferraro is not entitled to invoke the shield of qualified immunity. "State action for purposes of § 1983 is not necessarily co-extensive with state action for which qualified immunity is available." *Bracken v. Okura*, 869 F.3d 771, 776 (9th Cir. 2017) This is because § 1983 and the doctrine of qualified immunity serve different purposes. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158,

25-cv-01683-AJB-JLB

161 (1992). In contrast, qualified immunity "protect[s] government's ability to perform its traditional functions." *Id.* at 167. In turn, a government officer may not be able to invoke the defense of qualified immunity when he "uses the 'badge of their authority' . . . in service of a private, non-governmental goal." *Bracken*, 869 F.3d at 776 (quoting *Wyatt*, 504 U.S. at 161; citing *Richardson v. McKnight*, 521 U.S. 399, 404–12 (1997)).

Courts should "look both to history and to the purposes that underlie government employee immunity in order to find the answer" to whether an off-duty officer may invoke qualified immunity. *Id.* at 777 (quoting *Richardson*, 521 U.S. at 404). Courts accordingly apply a two-part assessment. "The first inquiry is whether 'history reveals a "firmly rooted" tradition of immunity.'" *Id.* (quoting *Richardson*, 521 U.S. at 404) (cleaned up). Second, courts consider "whether granting immunity would serve the purposes underlying the immunity doctrine." *Id.*

Both inquiries show that qualified immunity is not available to Ferraro on the facts before the Court. Preliminarily, Ding's allegations against Ferraro arise from a parking lot dispute and altercation between two private parties. (*See, e.g.*, Doc. No. 1 ¶¶ 31–39.) "Ferraro was off-duty at the time[,] . . . driving his personal vehicle[,] and wearing civilian clothes." (*Id.* ¶ 35.) According to Ding, "Ferraro was the aggressor who assaulted and battered Mr. Ding" when "Ferraro sprung out of his truck and began yelling," "pushed Mr. Ding," and "picked Mr. Ding up and slammed him to the ground." (*Id.* ¶¶ 31, 36–37, 230.) Against this backdrop, it appears that Ferraro was not carrying out any law enforcement activity before or during the altercation.

Turning to the first step in *Bracken*'s inquiry, the Ninth Circuit has recognized that immunity has historically been provided to both "public servants and private individuals *engaged in public service.*" *Filarsky v. Delia*, 566 U.S. 377, 387 (2012) (emphasis added). "The common law also extended certain protections to individuals *engaged in law enforcement activities.*" *Id.* (emphasis added). The alleged facts do not show that Ferraro was engaged in public service or law enforcement activities. (*Compare* Doc. No. 1 ¶¶ 31, 35–37, 230, *with Filarsky*, 566 U.S. at 387.) Ferraro's actions thus fall outside the scope of

where history "reveals a 'firmly rooted' tradition of immunity." *See Bracken*, 869 F.3d at 777 (quoting *Richardson*, 521 U.S. at 404).

Next, granting Ferraro qualified immunity would not serve its purposes. Ferraro was not performing any "public duties" or "carrying out the work of government." *See Filarsky*, 566 U.S. at 389–90. Providing immunity, in turn, would not "protect[] government's ability to perform its traditional functions." *Wyatt*, 504 U.S. at 167.

Based on Ding's allegations, qualified immunity is not available to Ferraro. *Bracken*, 869 F.3d at 778.[6] Defendants' motion to dismiss Counts One, Two, and Three against Ferraro is accordingly **DENIED**.

### b.   Richards and Emamjomeh

Ding alleges three § 1983 claims against Richards. First, Richards used excessive force by handcuffing Ding even though Ding had not broken any laws. (Doc. No. 1 ¶¶ 206–10.) Such excessive force was exacerbated by Richards cuffing Ding so tightly that the cuffs injured Ding. (*Id.*) Second, Richards wrongfully detained Ding when there was no basis for detaining Ding. (*Id.* ¶¶ 219–26.) Third, Richards falsely arrested Ding even though the surveillance recording showed there was no basis to detain or arrest Ding. (*Id.* ¶¶ 229–42.) Ding also asserts the third claim against Emamjomeh. (*Id.* ¶¶ 229–42.)

Richards and Emamjomeh are not entitled to qualified immunity from any of these claims.

Beginning with the excessive force claim, the Ninth Circuit has recognized that tightly handcuffing an individual in a way that unreasonably injures the individual constitutes a use of excessive force that violates the Fourth Amendment. *Hansen v. Black*,

---

[6] The Court's analysis raises questions regarding the viability of Counts One, Two, and Three as alleged against Ferraro. This is because § 1983 "protects against acts attributable to a State, not those of a private person." *Lindke v. Freed*, 601 U.S. 187, 194 (2024). Such questions may be mooted, for example, if it turns out that Ferraro actually "step[ped] back into a police officer role . . . to prevent a crime from occurring." *Bracken*, 869 F.3d at 778 n.6. Because Ding does not allege that such circumstances are present here, the Court does not endeavor to resolve whether Ferraro would be entitled to qualified immunity in such a situation. *See id.*

14

885 F.2d 642, 645 (9th Cir. 1989); *see also, e.g.*, *Wall v. County of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004).

Here, Ding alleges that Richards handcuffed him for approximately three hours and that the "handcuffs were so tight that it caused pain to [Ding's] wrists." (Doc. No. 1 ¶ 59.) Ding further asserts that Richards "knew that Mr. Ding was in pain from being handcuffed behind his back" while Ding was detained in Richards' vehicle "for hours." (*Id.* ¶ 207.) Despite this knowledge, "Richards refused to loosen" the handcuffs. (*Id.* ¶ 59.)

In reply, Defendants do not dispute that these allegations are sufficient to show that Richards violated a constitutional right or that the law was clearly established at the time of the underlying events. (*See generally* Doc. No. 24.)

Richards is consequently not entitled to qualified immunity on Count One and, in turn, dismissal is inappropriate. *See O'Brien*, 818 F.3d at 936. Defendants' motion to dismiss Count One against Richards is therefore **DENIED**.

Turning to the wrongful detention and false arrest claims, the Fourth Amendment requires that a detention be supported by facts and inferences that demonstrate a reasonable suspicion that the person detained may be involved in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Similarly, a "claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001). An officer may be entitled to qualified immunity for an arrest "if he reasonably *believed* there to have been probable cause." *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1076 (9th Cir. 2011). "In the context of an unlawful arrest . . . the two prongs of the qualified immunity analysis can be summarized as: (1) whether there was probable cause for the arrest; and (2) whether it is *reasonably arguable* that there was probable cause for arrest." *Id.* (citing *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007)).

Ding alleges that Richards and Emamjomeh did not have probable cause for detaining or arresting him. (Doc. No. 1 ¶¶ 217, 220, 223, 226, 229, 231, 241.) Instead,

25-cv-01683-AJB-JLB

Richards and Emamjomeh "knew that Ferraro was the aggressor who assaulted and battered Mr. Ding" and that "Ferraro had committed a crime." (*Id.* ¶¶ 230, 242.)

Under these circumstances, there was no reasonable suspicion or probable cause for Richards and Emamjomeh to detain or arrest Ding. *See Terry*, 392 U.S. at 30; *Dubner*, 266 F.3d at 964. Nor was there any basis on which Richards or Emamjomeh could reasonably believe that reasonable suspicion or probable cause existed for the detention or arrest. *See Rosenbaum*, 663 F.3d at 1076.

Richards and Emamjomeh therefore are not entitled to qualified immunity on Counts Two and Three, rendering dismissal inappropriate. *See O'Brien*, 818 F.3d at 936. Defendants' motion to dismiss Counts Two and Three against Richards and Count Three against Emamjomeh is thus **DENIED**.

### 2. Count Four – Failure to Allege Facts Establishing Personal Involvement

In Count Four, Ding alleges that Wahl and Ealson are liable pursuant to § 1983 for failing to supervise and discipline officers. (Doc. No. 1 ¶¶ 243–59.)

Defendants assert the claims against Wahl and Ealson must be dismissed because Ding fails to establish that Wahl or Ealson were personally involved with Ding's injuries and, instead, Ding "conflagrates" his purported supervisory claim with a *Monell* claim. (Doc. No. 14-1 at 19–21.)

Defendants are correct.

Supervisory liability may be based on a supervisor's "own culpable action or inaction in the training, supervision, or control of his subordinates"; his acquiescence in the constitutional deprivations of which the complaint is made"; or "conduct that showed a reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (citations omitted). Thus, a defendant may be held liable as a supervisor under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen*, 885 F.2d at 646. The causal

25-cv-01683-AJB-JLB

connection can be established by "knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Dubner*, 266 F.3d at 968.

Ding fails to establish either of these factors.

Beginning with Ding's allegations against Wahl, the allegations are conclusory at best. For instance, Ding claims that "Wahl . . . knew that [his] subordinates were routinely covering up for fellow officers' misconduct and engaging in retaliatory action against innocent citizens"; was "personally aware of the pattern of the code of silence among [his] employees"; and was "personally aware of the pattern of charging innocent people with resisting arrest in order to cover up the misconduct of police officers." (Doc. No. 1 ¶¶ 247–50; *see also id.* ¶¶ 253, 257.) Instead of providing any evidence to prove Wahl's awareness, Ding contends Wahl "served in the Chain of Command for years" and prioritized public relations over accountability. (*Id.* ¶¶ 254–56.) This stands in sharp contrast to the allegations in *Starr v. Baca*, where the plaintiff provided evidence demonstrating that the supervisory defendant was informed of specific alleged problems. 652 F.3d 1202, 1208–12, 1216 (9th Cir. 2011). Ding's conclusory allegations are thus insufficient to state a claim of supervisory liability against Wahl. *See Hansen*, 885 F.2d at 646; *cf. Starr*, 652 F.3d at 1216.

Ding's allegations against Ealson fall short for the same reason. First, Ding makes three of the same allegations against Ealson as he does for Wahl. (Doc. No. 1 ¶¶ 247–50.) Second, Ding's allegation that Ealson "knew or should have known of the dangerous and racist propensities of defendant Ferraro" similarly fails to provide evidence that Ealson was aware of the alleged issue. (*Compare id.* ¶ 246, *with Starr*, 652 F.3d at 1216.)

Moreover, Ding's failure to supervise and/or discipline claim against Ealson puts the cart before the horse. Based on the chronology of Ding's allegations, Ealson did not become involved until *after* the underlying altercation, detention, and arrest occurred. (*See generally* Doc. No. 1.) It defies common sense to say that Ealson somehow caused or contributed to the alleged constitutional violations that occurred *before* his involvement.

25-cv-01683-AJB-JLB

Given the inadequacies of Ding's § 1983 claims against Wahl and Ealson, Defendants' motion to dismiss Count Four is **GRANTED**.

### 3.      Count Five – Failure to Allege a Custom or Policy

Turning to Count Five, the *Monell* claim, a government entity may be held liable "when execution of [the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). An official policy "refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986).

Additionally, *Monell* liability may be present even if a practice or custom "has not been formally approved by an appropriate decisionmaker . . . on the theory that the relevant practice is so widespread as to have the force of law." *Hunter v. County of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011) (citation omitted). Absent a formal policy, a plaintiff must identify a "longstanding practice or custom which constitutes the standing operating procedure of the local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)). "The custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" *Id.* (quoting *Monell*, 436 U.S. at 691). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* (citations omitted).

A plaintiff must also show that the policy or custom "was (1) the cause in fact and (2) the proximate cause of the constitutional deprivation." *Id.* (citations omitted).

Ding alleges both that "San Diego promulgated and maintained an unconstitutional policy, ordinance or regulation which allowed its police officers to use excessive force in violation of the rights of citizens and engage in retaliatory arrests" and that there "existed

a pattern and practice for officers who use excessive force to retaliate and charge the victims with a crime of resisting arrest." (*Id.* ¶¶ 261, 264.) Ding further claims that the City's "*de facto* policies of failing to investigate and discipline and the culture of covering up misconduct were the moving force behind the [I]ndividual [D]efendants' mistreatment of Chu Ding." (*Id.* ¶ 269.)

Ding offers eight points as evidence of a custom or policy that "[t]he San Diego Police Department has a long history of the use of excessive and unnecessary force" and that "[i]t has a long history of supervisors acquiescing to the misconduct of their subordinates." (*Id.* ¶ 121.)

First, Ding points to the conduct of Officer Daniel McClain ("McClain"), who unlawfully detained Shannon Robinson ("Robinson") and Dante Harrell ("Harrell") during a 2010 traffic stop, and then unlawfully arrested Robinson. (*Id.* ¶¶ 122–23, 125.) Some time between 2010 and 2013, McClain was reported for unlawfully arresting another individual. (*Id.* ¶ 127.) Finally, in 2014, McClain pointed an AR-15 "at the head of a black man who had committed no crimes for a period of ten minutes." (*Id.* ¶ 130.) The City did not discipline or retrain McClain for the unlawful detention and arrest of Robinson, or the unlawful detention of Harrell. (*Id.* ¶¶ 124, 126.) McClain was promoted to being a supervisor by 2014, and a sergeant after that. (*Id.* ¶¶ 130–31.) As a sergeant, McClain trains and supervises other officers. (*Id.* ¶ 132.)

Ding also points to the conduct of Officer Ariel Savage ("Savage"), who participated in the detention and arrest of Robinson and Harrell in 2010. (*Id.* ¶¶ 122–23, 125.) In 2011, Savage falsely arrested another individual. (*Id.* ¶ 128.) Some time between 2010 at 2013, Savage was also reported for unlawfully arresting a fourth individual, and giving that individual a "rough ride" by accelerating and braking abruptly during the transport process. (*Id.* ¶ 127.) The City did not discipline or retrain Savage for the unlawful detention and arrest of Robinson, or the unlawful detention of Harrell. (*Id.* ¶¶ 124, 126.) Savage was promoted to a sergeant some time in or after 2015, and now trains and supervises other officers. (*Id.* ¶¶ 128–29, 132.)

Second, Ding notes that in 2015, Officer Neal Browder ("Browder") fatally shot Fridoon Nehad. (*Id.* ¶ 133.) Following the shooting, police officials allowed Browder and his attorney to review the evidence to "come up with a story to justify charging [a] victim with resisting arrest or being a threat." (*Id.* ¶¶ 135–36.) Additionally, in 2016, Browder "accidentally fired his gun into a baby's crib during a probation check"; the crib was located "in an empty bedroom." (*Id.* ¶ 137.) The City did not discipline Browder for the fatal shooting or the accidental shot. (*Id.* ¶¶ 138, 147.)

Third, Ding identifies multiple instances where a "conspiracy of silence" was alleged against City police officers. (*Id.* ¶¶ 148–51.) In one instance, City police officers were aware that Officer Anthony Arevalos ("Arevalos") had a "reputation . . . for his suspect behavior towards female arrestees." (*Id.* ¶¶ 152–53.) The City was ultimately sued because Arevalos "had been sexually assaulting women while on duty for years." (*Id.* ¶ 152.) Two former officers testified in the trial about the conspiracy of silence. (*Id.* ¶¶ 155, 157.) Arevalos himself testified that the conspiracy of silence protected captains "stopped for DUIs." (*Id.* ¶ 156.) Ding insists that these instances put the City on notice of the alleged conspiracy of silence. (*Id.* ¶ 159.)

Fourth, Ding cites a Voice of San Diego report indicating that the San Diego Police Department had "implemented 40 recommendations" following a review. (*Id.* ¶ 160.) The review suggested that supervisors perform monthly reviews and "look for signs of problematic behavior." (*Id.* ¶ 162.) However, "supervisors routinely missed red flags" and "were not required to follow up or provide a written record." (*Id.* ¶ 163.) As an example of this, the fatal shooting caused by Browder was not mentioned in his performance review. (*Id.* ¶ 164.)

Fifth, Ding relies on an inewsource and KPBS article that reported that the San Diego Police Department failed to identify what, if any, discipline was instituted in 93 police misconduct cases. (*Id.* ¶¶ 166–70.) These cases covered use of excessive force and racial and sexual discrimination. (*Id.* ¶¶ 170–71.) One such case was for Officer Timothy Romberger ("Romberger"), who, in 2017, used excessive force five times while arresting

three Black males and refused to provide one of the males medical care. (*Id.* ¶ 173.) There was no record of Romberger being disciplined for this incident. (*Id.* ¶ 174.) Romberger was subsequently investigated twice over the next two years, and was later fired "after he held a gun to his fiancé's [*sic*] head." (*Id.*)

Sixth, Ding claims that Officer Allyson Ford ("Ford") alleged in a lawsuit that new recruits laughed at a captain's "pejorative and harassing statements." (*Id.* ¶ 175.) Ford also alleged that she was retaliated against for reporting her "then-husband and fellow officer['s]" misconduct. (*Id.* ¶ 176.) When Ford reported the retaliation, the police department "chose to take no action." (*Id.* ¶ 177.)

Seventh, Ding alleges that in 2021, a Captain Alberto Leos ("Leos") discovered that officers forged documents under his name. (*Id.* ¶¶ 178–90.) Specifically, using Leos' signature, officers reduced the punishment level for an Officer Katherine Lonthair for a collision at the direction of a Chief Terrence Charlot ("Charlot"). (*Id.* ¶ 179.) Charlot had apparently similarly reduced another officer's punishment level for a collision. (*Id.* ¶ 180.) When Leos complained, his superiors "demanded" that he "go along with the program." (*Id.* ¶¶ 181–82.) In a third instance, a Chief Dave Nisleit ("Nisleit") reduced the punishment level for his own son's collision. (*Id.* ¶¶ 183–86.) Although the City Attorney's Office investigated Nisleit's conduct, the assigned investigator indicated to Leos that he "did not find any substantiation to the allegations" against Nisleit and that the investigator was "looking out for the department heads and the city." (*Id.* ¶¶ 189–90.)

Additionally, in 2022, Leos reprimanded an officer for making racist remarks and transferred the officer out of the Traffic Division. (*Id.* ¶ 191.) Ding contends that the officer had not "received any discipline" after being transferred out of the Traffic Division. (*Id.*)

Eighth, Ding reiterates that there is a "lengthy history of supervisors refusing to investigate and discipline officer misconduct" that "created a culture in which officers believe they are above the law." (*Id.* ¶ 197.) Ding adds that "[t]here has been a long tradition of looking the other way and retaliating against officers who come forward to report misconduct." (*Id.* ¶ 198.)

25-cv-01683-AJB-JLB

Defendants seek dismissal of Count Five, arguing that Ding fails to establish that any custom or policy exists. (Doc. No. 15-1 at 14–15.) Additionally, Defendants assert that Ding bases his allegations of a custom and/or policy on "factual situations that are significantly distinguishable." (*Id.* at 15.) Instead, Defendants contend Ding must identify a custom and/or policy based on incidents that are "sufficiently similar to show deliberate indifference." (*Id.* at 16.)

Ding's *Monell* claim falls short.

Ding bases his *Monell* claim on the generalized actions of the Individual Defendants. (*See* Doc. No. 1 ¶¶ 260–73.) He does not distinguish the Individual Defendants' actions or connect any specific Individual Defendant's actions to a particular policy or custom (formal or informal). (*See id.*) Such generalizations improperly force the Court to piece together the potential basis or bases for the *Monell* claim and unnecessarily complicate the Court's analysis. *See In re New Century*, 588 F. Supp. 2d 1206, 1218–19 (C.D. Cal. 2008) ("Neither courts nor defendants should have to wade through the morass of 'puzzle pleadings' as this wastes judicial resources and undermines the requisite notice for a defendant to respond.") (quoting *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1073–75 (N.D. Cal. 2001)). The Court nevertheless endeavors to discern and address each potential avenue of *Monell* liability so that a future amendment, if any, can provide greater clarity.

### a.   Ferraro

Beginning with the constitutional deprivations that Ferraro allegedly inflicted on Ding, Ding has failed to allege sufficient facts to claim that there is a City custom or policy that caused Ferraro's actions. To reiterate, Ding alleges that Ferraro, while off-duty, used excessive force during the altercation with Ding (Doc. No. ¶¶ 203–06) and unlawfully detained Ding (*id.* ¶¶ 216–18).

But not one of Ding's eight points establishing "a long history of the use of excessive and unnecessary force" addresses the actions of an *off-duty* officer. (*See generally id.* ¶¶ 121–201.) Absent evidence of a custom or policy that implicates off-duty individuals

25-cv-01683-AJB-JLB

and their actions, Ding has not identified a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity" that deprives individuals of their constitutional rights via off-duty officers. *Trevino*, 99 F.3d at 918.

Accordingly, Ding has failed to allege a *Monell* claim against the City based on Ferraro's actions.

### b.    Richards and Emamjomeh

Ding next asserts that Richards used excessive force by handcuffing Ding (Doc. No. 1 ¶¶ 207–10), unlawfully detained Ding (*id.* ¶¶ 220–21, 223–26), and falsely arrested Ding (*id.* ¶¶ 230–42). Ding additionally claims that Emamjomeh caused or contributed to Ding's false arrest. (*Id.* ¶¶ 230–42.) These purported violations were committed to retaliate against Ding and cover up Ferraro's misconduct. (*Id.* ¶¶ 58, 80, 209, 242.)

Ding fails to establish that there is a policy or custom that makes retaliating against individuals to cover up a fellow officer's misconduct a standard operating procedure. The only event that Ding identifies in which City officers purportedly violated an individual's civil rights to cover up a fellow officer's misconduct is the fatal shooting caused by Browder. (*Id.* ¶¶ 133–47.) Ding alleges that, following the shooting, police officials "provided Browder and his attorney with surveillance video of the shooting, which Browder and his attorney reviewed in a police lieutenant's office for approximately twenty minutes *before* the [homicide investigation] interview commenced." (*Id.* ¶ 135.) According to Ding, this was part of an "ongoing pattern and practice within the Department in which officers who engage in misconduct are given several days to meet with their lawyers, view all footage of the incident, and come up with a story to justify charging the victim with resisting arrest or being a threat." (*Id.* ¶ 136.)

Beyond Paragraph 136's conclusory assertion, however, Ding fails to identify any other incident or event to establish that some custom or policy of violating constitutional rights to retaliate against individuals to cover up a fellow officer's misconduct existed, much less that such purported violations were a "standard operating procedure." (*Compare id.* ¶¶ 122–201, *with Trevino*, 99 F.3d at 918.)

25-cv-01683-AJB-JLB

In turn, Ding has failed to allege a *Monell* claim against the City based on either Richards' or Emamjomeh's actions.

### c.  Wahl and Ealson

Given Ding's generalizations about "the individual defendants' mistreatment of Chu Ding," it is not clear if Ding seeks to allege a *Monell* claim based on the actions of either Wahl or Ealson. (*See generally* Doc. No. 1 ¶¶ 260–73.)

To the extent Ding seeks to base his *Monell* claim on Wahl's or Ealson's alleged actions, however, such a claim would fail. As previously discussed, Ding has failed to allege sufficient facts to establish that either Wahl or Ealson were personally involved in the purported constitutional deprivations. (*Supra* at 16–18.)

Any *Monell* claim based on such inadequate allegations also fails.

Because Ding has failed to provide sufficient allegations to state a *Monell* claim against the City for any of the Individual Defendants' actions, Defendants' motion to dismiss Count Five is **GRANTED**.

### 4.  Count Eleven – Failure to Allege Facts Establishing Intentional Infliction of Emotional Distress

To allege a claim for intentional infliction of emotional distress under California law, a plaintiff must assert "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001 (1993) (quoting *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991)).

In Count Eleven, Ding "realleges all prior paragraphs of this complaint and incorporates the same herein by this reference." (Doc. No. 1 ¶ 322.) Ding further alleges that Ferraro, Richards, Emamjomeh, and another officer "engaged in outrageous conduct with an intent to or a reckless disregard of the probability of causing Plaintiff to suffer emotional distress." (*Id.* ¶ 323.) "As a direct, proximate and foreseeable result, Plaintiff

suffered severe emotional distress and the outrageous conduct was the cause of the emotional distress suffered by Plaintiff." (*Id.* ¶ 325.)

Defendants assert Count Eleven should be dismissed because Ding "uses the formulaic recitation of the elements prohibited by *Twombly* and *Iqbal*." (Doc. No. 14-1 at 25.)

Count Eleven withstands scrutiny.

Defendants correctly note that Ding hews closely to a formulaic recitation of the elements in the portion of his Complaint labeled as "Eleventh Cause of Action." (*See generally* Doc. No. 1 ¶¶ 322–26.) Nevertheless, Ding begins that portion by "realleg[ing] all prior paragraphs of this complaint and incorporat[ing] the same herein by this reference." (*Id.* ¶ 322.)[7] Ding's preceding paragraphs provide sufficient factual allegations to plausibly give rise to a claim for relief under this Count. *See Iqbal*, 556 U.S. at 679. For instance, Paragraphs 29 through 38 describe the interaction between Ding and Ferraro, thereby pleading enough facts to allege that Ferraro engaged in outrageous conduct with an intent to cause, or with a reckless disregard to the probability of causing, emotional distress. Paragraph 272 indicates that Ding was "inflicted with emotional distress." And Paragraph 325 indicates that the emotional distress was caused by the alleged outrageous conduct.

Accordingly, Defendants' motion to dismiss Count Eleven is **DENIED**.

---

[7] The tactic of drafting "a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to be a combination of the entire complaint," is a method of "shotgun pleading." *Gibson v. City of Portland*, 165 F.4th 1265, 1288 (9th Cir. 2026) (quoting 35A C.J.S. *Fed. Civ. Proc.* § 310 (2025)). This tactic is problematic because it, among other things, "make[s] it difficult, if not impossible, for the opposing party to formulate a response" and "waste[s] scare judicial resources." *Id.* (quoting *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018)). Defendants do not contend that the Complaint violates Federal Rule of Civil Procedure 8, which "provides district courts with an additional *tool* that they *may* use to dismiss shotgun pleadings when identified—not a *rule* necessarily *requiring* district courts to do so, however prudent it may be." *Id.* at 1290. Accordingly, the Court does not see any reason to dismiss the Complaint as a shotgun pleading. Nevertheless, the Court encourages Ding and his counsel to take the amendment opportunity to clarify which specific facts are relevant to this Count.

25-cv-01683-AJB-JLB

**D.     Leave to Amend**

Ding requests leave to amend if there is any deficiency in his Complaint. (Doc. Nos. 21 at 25; 22 at 13.) Generally speaking, courts "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).

The Court finds that granting Ding limited leave to amend his Complaint is appropriate. Ding may file a first amended complaint that addresses the identified defects in Counts Four and Five. Ding may also use this opportunity to better conform his Complaint to Rule 8's requirements. Any first amended complaint must be filed on or before **May 26, 2026**.

**IV.     CONCLUSION**

For the foregoing reasons, Defendants' request for judicial notice/incorporation by reference is **GRANTED IN PART AND DENIED IN PART**. Defendants' motions to dismiss are similarly **GRANTED IN PART AND DENIED in PART**.

Ding may file a first amended complaint on or before **May 26, 2026**. Defendants must either answer Ding's remaining claims or respond to Ding's first amended complaint on or before **June 16, 2026**.

**IT IS SO ORDERED**.

Dated:  May 4, 2026

Hon. Anthony J. Battaglia
United States District Judge

26

25-cv-01683-AJB-JLB